**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND**

CIVIL ACTION NO. 26-2-DLB-EBA

BRANDEN BANNISTER                                                                                     PLAINTIFF

v.                           **MEMORANDUM ORDER AND OPINION**

KEVIN C. PEARCE, JR. et al.                                                                       DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. **INTRODUCTION**

This matter is before the Court upon the Joint Motion for Summary Judgment from Defendants Kevin C. Pearce, Jr. and Terry L. Melvin (Doc. # 107). Plaintiff Branden Bannister having filed his Response in Opposition (Doc. # 113) and Defendants having filed their Reply (Doc. # 116), the Motion is ripe for the Court's review. For the following reasons, Defendants' Motion for Summary Judgment is **granted**.

II. **FACTUAL AND PROCEDURAL HISTORY**

This case stems from a series of events that happened in 2021 at United States Penitentiary ("USP") Big Sandy ("Big Sandy") in Inez, Kentucky. At that time, Plaintiff Branden Bannister was imprisoned at Big Sandy and Defendants Kevin C. Pearce, Jr. and Terry L. Melvin served as prison lieutenants. (Doc. # 63 ¶¶ 7–9). Having received new evidence since it last explored the facts of this case, the Court provides the following summary of the events in this Action.

On or about April 20, 2021, Defendants removed Plaintiff from his cell at Big Sandy to take him to a body scanner for a contraband search. (Doc. # 113-2 at 6:3–9). Despite

1

the body scanner not indicating any contraband, Plaintiff was taken into Defendant Pearce's office and strip-searched. (*Id*. at 6:10–17). Plaintiff testified that while in Defendant Pearce's office, Pearce and other officers beat him with a baton and pepper-sprayed him, all while calling him racial slurs. (*Id*. at 7:6–8:4). Plaintiff was then returned to a Special Housing Unit ("SHU") where he was placed in waist-and-feet chains and a paper gown. (*Id*. at 8:12–18). The next day, Plaintiff attempted to file an informal complaint known as a BP-8, but was rebuffed because he did not receive the form from prison staff. (*Id*. at 18:3–12). He then asked for and received a BP-8 from staff, which he filled out and submitted with his team manager. (*Id*. at 19:21–21:21).

Plaintiff never received a response to his BP-8 form, so approximately two weeks after the April incident, he filed a formal BP-9 complaint. (Doc. # 107-6 at 25:7–17, 26:1–9). He never received a response to his BP-9 form. (*Id*. at 26:23). Plaintiff testified that he did not file a BP-10 or BP-11 because he did not believe he would be provided with one unless he received an answer to his BP-9 form. (*Id*. at 40:8–41:25).

Plaintiff's next encounter with Defendants happened a few months later in August 2021. On the morning of August 27, 2021, Defendants removed Plaintiff from his cell in the SHU and moved him to a separate restraint cell. (Doc. # 113-2 at 12:16–24). Plaintiff testified that five prison officials—three officers and Lieutenants Pearce and Melvin— entered the restraint cell and ordered Plaintiff into the corner of the cell. (*Id*. at 13:18–20). From there, Plaintiff testified that Defendants choked him, smacked him, and held a pepper spray gun to his face, all while calling him a number of racial slurs. (*Id*. at 13:18–24). Officers then returned Plaintiff, bloodied from the beating, to his cell where he remained until prison staff found him later that day. (*Id*. at 16:16–17:22; *see also* Doc. #

113-4 at 3:9–16). When prison staff recovered Plaintiff, he had blood on his clothing spanning the whole length of his shirt and on his pants. (Doc. # 113-4 at 15:15–16:16).

Shortly after the incident, Plaintiff properly filed a BP-8 which went unanswered. (Doc. # 107-6 at 33:22–35:1). About two weeks later, on September 7, 2021, Plaintiff filed a BP-9 with Big Sandy staff which also went unanswered. (*Id*. at 35:2–11, 40:8–11). Plaintiff was transferred to USP Lee in Pennington Gap, Virginia in October 2021 and later transferred to USP McCreary in Pine Knot, Kentucky in February 2023. (Doc. # 107 ¶¶ 5, 7). He was subsequently released from Bureau of Prisons ("BOP") custody on April 4, 2024 and is currently on supervised release. (Doc. # 107-6 at 9:25–10:6).

Plaintiff brought this lawsuit on August 26, 2022. (Doc. # 1). His initial Complaint alleged two claims: (1) Defendants violated his Eighth Amendment right to be free from cruel or unusual punishment; and (2) Defendants conspired to interfere with his civil rights in violation of 42 U.S.C. § 1985.[1] (Doc. # 1 ¶¶ 33–41). Defendants filed separate Motions to Dismiss (Docs. # 22 and 27), claiming that Plaintiff failed to effectively plead a claim under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and claiming that Plaintiff failed to adequately plead a conspiracy to violate his civil rights. After being fully briefed on the Motions, on August 23, 2023, this Court dismissed Plaintiff's *Bivens* claim but allowed Plaintiff's conspiracy claim to proceed to discovery. (Doc. # 44).

---

[1] Plaintiff additionally named Hector Joyner, Warden of USP Big Sandy, as a Defendant in this action, claiming that Joyner failed to "investigate, supervise and discipline staff" and failed to "inculcate policies, customs, and practices to prevent the mistreatment Plaintiff endured." (Doc. # 1 ¶¶ 3, 34–37). Joyner filed a Motion to Dismiss claiming, among other arguments, that Joyner only had supervisory liability and played no direct role in violating Plaintiff's constitutional rights. (Doc. # 23 at 12). This Court agreed and dismissed Plaintiff's claims against Joyner. (Doc. # 44 at 13).

On April 18, 2024, Plaintiff filed an Amended Complaint (Doc. # 63), wherein he brought new claims of (1) vicarious liability and (2) negligent hiring, training and supervision against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). (Doc. # 63 ¶¶ 35–45). On September 17, 2024, the United States filed a Motion to Dismiss the claims against it, citing lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because it never waived its sovereign immunity. (Doc. # 71). The Court granted the Motion on February 4, 2025 and dismissed the Government as a Defendant. (Doc. # 84).

Discovery is ongoing in this matter. (*See* Doc. # 105). However, on August 25, 2025, Defendants filed their Joint Motion for Summary Judgment, specifically claiming that Plaintiff failed to exhaust the BOP's administrative remedy process before filing his case in federal court. (Doc. # 107 at 3). With Plaintiff having filed a Response (Doc. # 113), and Defendants having filed their Reply (Doc. # 116), the motion is now ripe for the Court's review.

### III. ANALYSIS

Federal Rule of Civil Procedure 56 allows for the granting of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party or parties bear the burden of showing an absence of a genuine issue of material fact. *Sigler v. Am. Honda Motor Co.*, 532 F. 3d 469, 483 (6th Cir. 2008). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must view the evidence and draw all

reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. At this stage, the Court must not weigh evidence or make credibility determinations but instead must ascertain whether there is a genuine issue for trial. *Moran v. Al Basit LLC*, 788 F. 3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249). In making this determination, the Court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F. 3d 654, 665 (6th Cir. 2001).

### A.     Timing of the Motion

The Court first addresses Plaintiff's contention that Defendants' Motion is premature because discovery is still ongoing. (Doc. # 113 at 13–14). Plaintiff contends Defendants filed their motion before he had the opportunity to (1) depose Defendants; (2) review the documents produced in response to Plaintiff's Motion to Compel (Doc. # 93; Doc # 102); and (3) receive and review responses to the August 27, 2025 subpoena *duces tecum* to the Government. (*Id*.). Plaintiff alleges that the depositions to be taken and the documents to be reviewed are relevant to both his conspiracy claims and the issues surrounding his administrative remedy exhaustion. (*Id*. at 14). In response, Defendants counter that the facts Plaintiff alleges in the unviewed documents are immaterial to the issue of remedy exhaustion. (Doc. # 116 at 13). They further maintain

5

that allowing the case to continue further into discovery will "'frustrate[] this central purpose of the [Prison Litigation Reform Act.'" (*Id*. at 14 (quoting *Wagle v. Corizon*, No. 2:19-CV-12787, 2021 WL 12180662, at *2 (E.D. Mich. Sept. 24, 2021))).

Motions for summary judgment may be brought "at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b).  However, the Sixth Circuit has held that a "plaintiff must receive a full opportunity to conduct discovery to successfully defeat a motion for summary judgment." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). "Consequently, a ruling on the motion's merits will be improper in the absence of sufficient time for discovery." *Ashland Hosp. Corp. v. Cmty. Reinvestment Agency of Ohio, Inc.*, No. CV 10-83-DLB, 2011 WL 13312315, at *1 (E.D. Ky. Jan. 11, 2011).

Federal Rule of Civil Procedure Rule 56(d) accounts for situations where the nonmoving party does not have all the facts at their disposal. In that situation, if the nonmoving party shows by affidavit or declaration that it cannot present facts essential to justify its opposition, the court *may* (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. FED. R. CIV. P. 56(d) (emphasis added). The Sixth Circuit has interpreted this to mean that a plaintiff must somehow—perhaps by affidavit, motion, or other form of notice—indicate to the district court the facts it hopes its requested discovery will unveil. *Short v. Oaks Correctional Facility*, 129 F. App'x 278, 281 (6th Cir. 2005). In these cases, "the non-movant bears the obligation to inform the district court for its need for discovery. . . ." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002). This showing requires the non-movant to indicate to the

6

reviewing court "'what material facts [they] hope[d] to uncover and why [they] ha[d] not previously discovered the information.'" *Cacevic v. City of Hazel Park*, 226 F.3d 483, 489 (6th Cir. 2000) (quoting *Radich v. Goode*, 886 F.2d 1391, 1393–94 (3d Cir. 1989)).

Here, Plaintiff neither filed an affidavit nor made a motion for the Court to grant him extra time for discovery. He addressed the issue of extra time for discovery and the outstanding documents he would use at the end of his Response, but he did not address specifically what outstanding material information he believed would pertain to administrative remedy exhaustion. (Doc. # 113 at 13–14). Plaintiff claims those depositions and relevant documents are "directly relevant to the issues surrounding his administrative remedy exhaustion." (*Id*. at 14).

The Court first notes that Plaintiff's failure to submit an affidavit or motion in accordance with Rule 56(d) is reason enough to deny Plaintiff's contention and continue reviewing the Motion. *Scadden v. Werner*, 677 F. App'x 996, 1000 (6th Cir. 2017). In view of that and without an affidavit or other motion, the Court finds Plaintiff's stated theories too threadbare to delay a ruling on Defendants' Motion. Plaintiff's Response does not indicate what material facts he hopes to uncover through the additional discovery. He did not specifically state what information about his administrative remedies he believed he would receive from deposing Defendants Pearce and Melvin. In the same vein, Plaintiff did not specifically state how the issues in the outstanding documents and records would reveal any helpful information about his administrative remedy exhaustion. Without more, there is no reason for the Court to believe more discovery on remedy exhaustion needs to take place, and the Court will accordingly address Defendants' Motion.

7

### B. Administrative Remedy Exhaustion

Defendants seek summary judgment solely on the issue of whether Plaintiff exhausted the administrative remedies available to him under the Prison Litigation Reform Act ("PLRA"). (Doc. # 107 at 11). They contend that Plaintiff did not complete the BOP's four-step Administrative Remedy Program before bringing this lawsuit, which they claim is grounds for this suit's dismissal. (*Id*.). Plaintiff concedes that he did not submit a BP-10 or BP-11 form, but he maintains that he completed as much of the administrative process as Big Sandy policies allowed for him to complete. (Doc. # 113 at 8). He asserts that, in practice, Big Sandy does not make the entire remedial process available, so the steps he completed serve as an exhaustion of the remedies made available to him. (*Id*. at 13).

Congress enacted the PLRA in 1995 "to address the large number of prisoner complaints filed in federal court." *Jones v. Bock*, 549 U.S. 199, 202 (2007). As part of the Act, prisoners are required to exhaust the respective prison grievance procedures before filing a suit in federal court. *Id*. (citing 42 U.S.C. § 1997e(a)). Specifically, the PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Prisoners must "exhaust administrative remedies even where the relief sought—

monetary damages—cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). The PLRA does not govern the remedies prisoners must follow—rather, prisoners must "'complete the administrative review process in accordance with the applicable procedural rules,' . . . rules that are defined . . . by the prison grievance process itself." *Bock*, 549 U.S. at 218. "To further the purposes behind the PLRA, exhaustion is required even if the prisoner subjectively believes the remedy is not available, even when the state cannot grant the particular relief requested, and 'even where [the prisoners] believe the procedure to be ineffectual or futile. . . .'" *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 222 (6th Cir. 2011) (internal citations omitted). "Because Defendants bear the burden of proof on exhaustion, they bear an 'initial summary judgment burden [that] is higher in that [they] must show that the record contains evidence satisfying [their] burden of persuasion' and 'that no reasonable jury would be free to disbelieve it.'" *Does 8–10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

It thus follows that, for this case to proceed, Plaintiff first had to have exhausted the remedies made available to him at Big Sandy which are found in the BOP's Administrative Remedy Program. 28 C.F.R. § 542.10. The Supreme Court ruled that exhaustion must be "proper," meaning that the requisite exhaustion of remedies "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Ngo*, 548 U.S. at 90–91. The BOP's Remedy Program consists of four steps: (1) seeking informal resolution with a staff member using a "BP-8" form; (2) submitting a grievance to the Warden on a "BP-9" form; (3) appealing to the Regional Director on a "BP-10" form within twenty days of the Warden's response;

and (4) appealing to the General Counsel of the Central Office on a "BP-11" form within thirty days of the date of the Regional Director's response. *Risher v. Lappin*, 639 F.3d 236, 238–239 (6th Cir. 2011) (citing 28 C.F.R. §§ 542.13–15). "If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 524.18.

It is undisputed that Plaintiff was a federal inmate when he initiated this suit and was thus required to exhaust the administrative remedies available to him before commencing this suit. It is further undisputed that Plaintiff did not complete the entire administrative cycle—he admits to filing only BP-8 and BP-9 forms. (Doc. # 107-6 at 40:8–14). There is no genuine issue of material fact that Plaintiff did not file the necessary BP-10 and BP-11 forms.

Plaintiff claims there is a reason for that, and that reason is that those forms—and thus an integral part of the remedy process—were not available to him because he had not received a response to his BP-9 forms. (Doc. # 113 at 11–12; Doc. # 107-6 at 40:8–41:2). Thus, the question the Court must decide is whether the full grievance process was "available" to Plaintiff when he sought relief at Big Sandy.

There are three general circumstances where an administrative scheme is considered "unavailable" to provide relief. *Ross v. Blake*, 578 U.S. 632, 643 (2016). The first is when proceedings "operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. Next, a system might be "so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, a system is unavailable to provide relief when prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or

10

intimidation." *Id*. Notably, "[e]ven if an inmate has evidence to show that an administrative procedure was unavailable, he is not automatically absolved from the PLRA's exhaustion requirement because [the Sixth Circuit] requires inmates to make 'affirmative efforts to comply with administrative procedures before analyzing whether the facility rendered these remedies unavailable.'" *Lamb v. Kendrick*, 52 F.4th 286, 293 (6th Cir. 2022). Because Plaintiff does not specifically indicate which circumstance renders Big Sandy's administrative procedures unavailable, the Court will analyze Plaintiff's contentions under all three scenarios outlined in *Ross*.

First, the Court finds that, even in the case of Plaintiff Bannister, the system does not operate as a dead end such that relief is impossible. In *Ross*, the Supreme Court articulated a "dead end" exists where the procedures in place cannot functionally accord inmates the relief they seek or where prison officials "decline to ever exercise" authority given to operate the grievance system. *Ross*, 578 U.S. at 643. Plaintiff admitted when deposed that he never made an effort to file a BP-10 form, thinking he was ineligible. (Doc. # 107-6 at 41:23–25). Officer Philip Kute, a counselor with the BOP, testified that he would generally not provide an inmate with a BP-10 unless the inmate had received a response to the inmate's previously submitted BP-9. (Doc. # 107-8 at 36:9–12). However, Officer Kute also testified that in the event an inmate asked for a BP-10 without having received a response on their BP-9, he would either "try to find out what happened to the 9" or "if there was no response coming or something, I would give an inmate a BP-10." (Doc. # 116-2 at 7:6–19). It follows that, had Plaintiff asked for a BP-10 from prison staff, staff would have either (a) searched for the answer to his BP-9, which would have resulted in Plaintiff getting a BP-10, or (b) concluded that no response was coming and

11

given Plaintiff a BP-10.  Both options required Plaintiff to at least *try* to continue the remedial process, and the record clearly reflects he did not.

Further, Plaintiff would have known about the administrative system and its idiosyncrasies.  Plaintiff participated in the orientation programs at Big Sandy, USP Lee and USP McCreary, all of which included a program on the Administrative Remedy Program.  (Doc. # 107-4 at 3, 7, 11).  At a minimum, Plaintiff had access to and visited Big Sandy's law library, where he could have found that a non-response would be treated as a denial, at which point he could move to the next phase of the administrative process. (Doc. # 107 ¶ 21).  Finally, the record reflects that the BOP's system has a method of submitting a BP-10 directly to the Regional Office if the issue is "sensitive."  (Doc. # 107-5 at 56).  Thus, there were options available to Plaintiff for initiating the filling process for a BP-10, even without receiving a response to his BP-9.

Next, the BOP's system is not the sort that is "so opaque" that inmates like Plaintiff would not be able to discern or navigate it.  This is evidenced by the numerous Big Sandy inmates listed on the SENTRY reports and "green books" who utilized the system at various levels.  (*See generally* Docs. # 107-10 and 113-9).  Big Sandy's records show that inmates regularly filed the forms through the administrative remedy process.  Indeed, Plaintiff himself took advantage of the administrative process and claims his "complaint was resolved in his favor" through that process.  (Doc. # 113 at 7–8).  A system that is regularly used and accords relief is not the kind that is "so opaque" that it is unavailable to inmates.

Finally, the record does not reflect that prison officials have any hand in Plaintiff's complaints with the administrative system.  As discussed *supra*, Officer Kute testified that

he would give a BP-10 form without a BP-9 answer if the circumstances called for it. (Doc. # 116-2 at 7:6–19). While prison officials' standard practice may be to rely on a BP-9 answer before issuing a BP-10, the record reflects that practice is not ironclad and that officials were not perpetual roadblocks in the administrative process. Rather, when necessary and asked to, officials would provide inmates with the required forms to further the grievance process.

Read plainly, the record reflects that Plaintiff never attempted to file a BP-10 or BP-11. While the administrative remedy process may not have been crystal clear to Plaintiff, that does not mean it was faulty or unavailable. *Napier*, 636 F.3d at 222. Further, Plaintiff was required, at least, to *attempt* to exhaust the grievance process, and he admittedly did not. *Kendrick*, 52 F.4th at 293. As such, it is clear to the Court that no reasonable jury could conclude that Plaintiff exhausted the administrative remedies available to him. It is further clear that the grievance process was available to Plaintiff and he chose not to utilize it. For those reasons, the Court concludes summary judgment in favor of Defendants on the issue of remedy exhaustion is appropriate, and Defendants' Motion for Summary Judgment is **granted**.

IV.    **CONCLUSION**

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)    Defendants' Motion for Summary Judgment (Doc. # 107) is **GRANTED**;

(2)    This matter is **STRICKEN** from the Court's docket;

(3)    A **Judgment** in favor of **Defendants** will be filed contemporaneously.

This 4th day of March, 2026.



Signed By:
David L. Bunning
Chief United States District Judge

G:\Judge-DLB\DATA\ORDERS\Ashland Civil\2026\26-2 MOO re MSJ.docx